## Turner v. SEPTA

*Peter J. McNamara,* for plaintiff.
*William J. Faust,* for defendants.

HERRON, *J.*, February 10, 1993—In this case, the court finds against plaintiff, who sought to hold defendant SEPTA liable for injuries he sustained as a result of a criminal assault by three co-defendants. The court finds that SEPTA is immune from such suit. The court awards damages against the three individual co-defendants.

## I. BACKGROUND

The following facts were adduced at a non-jury trial on January 23, 1993.

On January 8, 1990, plaintiff Michael Turner, Jr. boarded a SEPTA bus, Route 20, outside of Archbishop Ryan High School where he was a student. At a sub-

sequent stop, a group of youths, including Chris Low, Aaron Small and Robert McGehee (collectively the "hooligans") boarded the bus. Soon after boarding the bus, the hooligans began accosting female passengers in a lascivious manner and heckling other passengers. The hooligans were drinking beer and smoking marijuana. At some point, they turned their attention to Turner and demanded that he relinquish his seat. Turner neither verbally responded nor got up. The hooligans, led by Low, assaulted Turner, at first punching him about the head and face and then kicking him when he lay on the floor, "covering up."

At a provident moment, Wayne West, a concerned passenger, entered the fray and pulled Turner to the back of the bus. With West acting as a buffer, the hooligans stopped their assault and one threatened West with a knife. While West confronted the knife wielder for a few minutes, another one of the hooligans sneaked around West and resumed the assault on Turner. West again intervened to protect Turner, after which the hooligans' threats toward West became more serious. West heroically held up his duffel bag and represented that it held firearms and that he was willing to use them. Thereafter, the bus stopped and the hooligans exited.

During the first assault, the lull, and the second assault, West and other passengers shouted to the bus driver urging him to take action, such as stopping the bus and summoning the police. Both West and Turner testified that, at all relevant times, the bus held 15-20 passengers.[1] The bus driver and a passenger held different views of what happened.[2]

---

1. The testimony of West, who was not available to testify at trial, was submitted via his deposition transcript.

2. Although the versions of the events differed somewhat, the court found all witnesses credible and that the versions are not mutually inconsistent.

Williams Hayes, the bus driver, noticed shortly after the hooligans got aboard that some youths were involved in some horseplay and a shoving match. He saw a group of youths' building a human wall across the width of the bus, standing on the seats, piling on one another, and hanging from the handrails suspended from the ceiling. Because of this wall, he soon became unable to see what transpired in the rear of the bus. After shouting several times to "knock it off" or "cut it out," Hayes heard a frightened yell about a weapon and pressed the dashboard button requesting SEPTA control to allow him access to radio contact. He then pressed a second button which informs SEPTA control that this request deserves a priority treatment. Then Hayes activated his distress signals: a yellow flashing light atop the bus and a distress message on the outside destination panel on the front of the bus which stated: "Help—call police." The flashing yellow light is a signal to any police units which see it that their services are needed on the bus. The distress message is displayed only on the outside of the bus so that criminals inside the bus would not know help had been summoned. Although Hayes received acknowledgment from control that his request for radio access was received, he never actually got the requested access. He repeatedly requested access and priority, with no results. There was no evidence explaining the failure to achieve radio contact with SEPTA control.

The bus seats 39 people and the driver allows as many people to crowd in as wish to. This is SEPTA policy.

After taking these measures, Hayes continued to drive the route, stopping only to allow passengers to disembark, taking on no new passengers. Hayes believed the bus to be holding 70 to 90 passengers, perhaps half of whom

he described as "kids." Hayes continued on the route to the terminal where he kept the bus doors closed until police were present.

Bill McCullough was a passenger on the bus at the relevant time. He occupied a seat almost directly opposite the driver. McCullough believed the bus was quite full, holding 70 to 80 people. He saw a ruckus going on toward the rear of the bus which alarmed him. Shortly after he got on, he could no longer see the back of the bus because "kids" built a human pyramid in the middle of the bus, climbing atop one another. McCullough observed Hayes requesting radio contact and pressing the priority button and was able to see the reflection of the distress signal in store windows. After Hayes' repeated fruitless attempts to establish radio contact with SEPTA control, McCullough disembarked at the Cottman Avenue and Roosevelt Boulevard stop to call the police from a pay phone. Unable to find a phone in working order, McCullough boarded a Route 14 SEPTA bus which was directly behind the bus he had left. McCullough informed the Route 14 bus driver of the disturbance on the Route 20 bus, and that driver notified SEPTA control, who summoned the police which greeted the Route 20 bus on its arrival at the terminal.

By way of a complaint, plaintiff brought this suit as an arbitration matter on December 11, 1991. On January 30, 1992, the prothonotary entered a default judgment against defendant Small. On March 24, 1992, the prothonotary entered default judgments against defendants Low and McGehee. On October 21, 1992, a panel of three arbitrators found in favor of SEPTA and awarded plaintiff $20,000 against the individual defendants. The instant trial was an appeal from that award.

Plaintiff's contention is that Hayes' failure to take more action to protect him from the criminal activity ultimately resulted in his injury.

Defendant claims that SEPTA enjoys statutory governmental immunity from this suit, and that its driver had no duty to take any more action than he did.

For the reasons which follow, the court finds for defendant SEPTA.

## II. DISCUSSION

SEPTA is a Commonwealth agency entitled to sovereign immunity as set forth in 1 Pa.C.S. §2310. *Chambers v. SEPTA,* 128 Pa. Commw. 368, 563 A.2d 603 (1989). The availability of sovereign immunity to suits in which SEPTA is a defendant is determined by recourse to the Pennsylvania Tort Claims Act, 42 Pa.C.S. §§8521-8528. See e.g., *Chambers v. SEPTA, supra.* Under section 8522, a plaintiff must meet three conditions to overcome the presumption of sovereign immunity. Section 8522(a) requires the plaintiff to have a cause of action under the common law or statute which would be viable against a party who cannot raise the sovereign immunity defense. Section 8522(a) also requires that the injury be caused by negligent acts of an agent of the Commonwealth agency. After satisfying these two conditions, the plaintiff must prove the negligent act fits into one of eight immunity exceptions set out in section 8522(b), one of which, section 8522(b)(1), provides:

"(b) Acts which may impose liability.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

"(1) Vehicle liability.—The operation of any motor vehicle in the possession or control of a Commonwealth party."

### 1. *Cause Of Action*

For the purpose of determining SEPTA's immunity to this suit, the court will assume Turner has a cause of action which could be maintained against a party without immunity.

### 2. *Negligent Acts By An Employee Of A Commonwealth Agency*

It is clear that in this case the negligence alleged consists of acts or a failure to act by William Hayes, the driver of the bus on which Turner was assaulted. Hayes is admittedly an employee of the Commonwealth agency. Plaintiff, therefore, satisfies this condition.

### 3. *Whether The Alleged Negligence Fits Into The Section 8522(b)(1) Vehicle Exception To Sovereign Immunity*

In *Mascaro v. Youth Study Center,* 514 Pa. 351, 523 A.2d 1118 (1987), our Supreme Court addressed a similar issue under the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§8541-8564.[3] *Mascaro* involved a claim

___

3. The Political Subdivision Tort Claims Act is analogous to the Commonwealth Agency Tort Claims Act and cases applying the former will be used in applying the latter. *SEPTA v. Hussey,* 138 Pa. Commw. 436, 588 A.2d 110 (1991), *allocatur den.,* 530 Pa. 649, 607 A.2d 258 (1992).

brought under the real estate exception to immunity under section 8542(b)(3).[4] *Id.* at 354, 523 A.2d at 1119-20. In that case, several youths escaped from a youth detention facility and committed violent crimes against a family. *Id.* The plaintiffs alleged the youths were able to escape because the city negligently operated the facility.[5] *Id.* In holding that the city was immune, the court stated:

"Since section 3 is an exception to the rule of immunity, we believe that its extent must be narrowly interpreted given the expressed legislative intent to insulate political subdivisions from tort liability." *Id.* at 361, 523 A.2d at 1123 (citations omitted).

After reviewing several cases regarding landowner liability for injuries, the court held:

"We believe those cases to have been decided correctly and they persuade us to hold that the real estate exception can be applied only to those cases where it is alleged that the artificial condition or defect of the land *itself* causes the injury, not merely when it facilitates the injury

---

4. That section provides:

"(b) Acts which may impose liability.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency: ...

"(3) Real property.—The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency." 42 Pa.C.S. §8542(b)(3).

5. Plaintiffs argued that the city failed to secure locks, doors and windows and provide sufficient guarding to prevent the escape. *Mascaro, supra* at 360, 523 A.2d at 1123.

by the acts of others, whose acts are outside the statute's scope of liability.

We believe the legislature has clearly precluded the imposition of liability on itself or its local agencies for acts of third parties by its language of section 8541, *supra*, and that it has not seen fit to waive immunity for these actors or their acts in any of the eight exceptions." [6] *Id.* at 363, 523 A.2d at 1124.

The court subsequently, in *Crowell v. City of Philadelphia,* 531 Pa. 400, 406, 613 A.2d 1178, 1180-81 (1992), indicated that the local agency's involvement must be that of an act which is a substantial contribution to the injury in order to overcome sovereign immunity.

In *SEPTA v. Hussey,* the Commonwealth Court applied the narrow interpretation of legislated exceptions to sovereign immunity for local agencies, as set out in *Mascaro* and other cases, to facts similar to those in this case. *Id.* at 440, 588 A.2d at 112, *allocatur den.,* 530 Pa. 649, 607 A.2d 258 (1992).

In *Hussey,* a passenger alit from a train and assaulted plaintiff when the trainman opened the door, causing serious injury. *Id.* at 438, 607 A.2d at 110-111. Prior to the assault, plaintiff and others were involved in an argument with the assailant through the closed doors. *Id.*

---

6. Subsequently, in *Crowell v. City of Philadelphia,* the Supreme Court prevented *Mascaro* from being applied to its absurd extremes, holding that immunity extended only to those situations where the local agency's liability was vicarious, and that its decision did not apply to situations where liability was joint.

at 438, 607 A.2d at 111. Plaintiff's argument was that the trainman should have either not opened the doors or enlisted the help of willing passengers, police or employees to quell the disturbance. *Id.* Since the opening of the doors involved the operation of a motor vehicle, plaintiff argued, the motor vehicle exception to SEPTA's local agency immunity applied. *Id.*

The *Hussey* court reasoned that since the local government immunity as interpreted in *Mascaro, supra,* and sovereign immunity statutes were similar and had the same legislative purpose, they should be similarly applied. *Hussey,* at 441-42, 588 A.2d at 112 (citing *Snyder v. Harmon,* 522 Pa. 424, 562 A.2d 307 (1989)). Indeed, the vehicle liability portions of sections 8522 and 8542 are almost identically worded. Compare 42 Pa.C.S. §8522(b)(1) with 42 Pa.C.S. §8542(b)(1); accord *Hussey,* at 442, 588 A.2d at 113. The *Hussey* court held that SEPTA was immune, concluding:

"It therefore follows that a Commonwealth party is not subject to liability under the vehicle liability exception to sovereign immunity for the criminal acts of third parties even if they were facilitated by the Commonwealth agency's operation of a vehicle." *Id.* at 442, 588 A.2d at 113.

In *Evans v. SEPTA,* 149 Pa. Commw. 376, 613 A.2d 137 (1992), an even more similar case, the Commonwealth Court upheld summary judgment granted to SEPTA on the issue of immunity. In *Evans,* a SEPTA elevated train passenger fled from three other passengers who were menacing her. *Id.* at 378, 613 A.2d at 138. The three caught up with plaintiff on a platform between cars and assaulted her, inflicting serious injury. *Id.* Citing *Hussey, supra, Chevalier v. City of Philadelphia,* 516

Pa. 316, 532 A.2d 411 (1987); *Moore v. Department of Justice,* 114 Pa. Commw. 56, 538 A.2d 111 (1988), *appeal dismissed,* 523 Pa. 418, 567 A.2d 1040 (1990); and *Mascaro, supra,* the *Evans* court held that SEPTA's operation of the elevated train at most facilitated the assault, which was carried out by third parties. *Evans,* at 381, 613 A.2d at 139. The *Evans* court found that the superseding cause of the criminal acts by third parties "absolved SEPTA of any liability...." *Id.*

This court cannot distinguish the instant case from *Hussey* and *Evans.* As in those cases, this plaintiff's injuries stemmed from a superseding cause: the criminal assault of third parties. Although SEPTA's driver operated the bus and did not quell the disturbance, his acts merely facilitated Turner's injuries. The operation of the motor vehicle was not a substantial contributor to Turner's injuries, therefore, SEPTA is immune from this suit.[7]

### III. DAMAGES

At trial, plaintiff testified at length about the injuries he suffered from the assault. These included, inter alia, irreparable tooth injuries and multiple contusions about the face and head, which caused plaintiff to suffer from headaches for some time. In addition, plaintiff suffered from extreme embarrassment and humiliation from this public attack. This court assesses damages for these injuries at $15,000.

---

7. On November 19, 1992, the Honorable Eugene Maier denied defendants' motion for summary judgment on the same issue. The court agrees that this issue was not ripe for summary judgment because it was a factual issue whether or not plaintiff's injuries arose from defendant's operation of the bus.